IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDRZEJ PTASZNIK, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| UNIVERSITY OF PENNSYLVANIA, | : | NO. 10-3941 |
| Defendant. | : | |

FILED
FEB 29 2012
MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## MEMORANDUM

BUCKWALTER, S.J.                                                                 February 29, 2012

Defendant University of Pennsylvania has filed the present Motion for Summary Judgment on Plaintiff Andrzej Ptasznik's Complaint. For the following reasons, the Motion is granted.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

On July 5, 2000, Defendant offered Plaintiff the position of Research Assistant Professor of Medicine in the School of Medicine's Hematology/Oncology Division. (Def.'s Mot. Summ. J., Ex. 6.) Drs. Stanley Goldfarb and Stephen Emerson, who signed the letter, informed Plaintiff that they were recommending an initial appointment of three years, and that Plaintiff would be reviewed for reappointment at the end of that time. (Id.) The offer letter also stated that positions such as Plaintiff's were "either for a specified term or duration of the grant or contract which support the faculty member's work, whichever is the shorter period of time. Failure to achieve promotion in the sixth year may result in a terminal one-year appointment, assuming grant support is available to fund the appointment." (Id.) As a member of the research faculty,

Plaintiff's salary was derived from funds allocated to Dr. Alan Gewirtz, Plaintiff's faculty mentor. (Id.) Plaintiff was expected to develop his own research focus in addition to collaborating on projects with Dr. Gewirtz. (Id.)

The Provost's Staff Conference Subcommittee ("PSCS") approved Plaintiff's appointment from October 1, 2000 until June 30, 2003. (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") 7; Def.'s Mot. Summ. J., Ex. 7.) On May 2, 2003, the PSCS reappointed Plaintiff "for three years effective July 1, 2003 or for the duration of the grant or contract which supports his work, whichever is the shorter period of time . . . ." (Id., Ex. 8.)

In October 2004, Plaintiff learned that he had been approved for an R01 grant. (Id., Ex. 9.) In April 2005, Plaintiff sought his own lab space, independent of Dr. Gewirtz, but his requests were denied on the grounds that no such space was available. (Id., Exs. 10, 11.) According to Plaintiff, he was told by Dr. Emerson that he would not get the space because "we have a younger faculty to take care of here at U. Penn." (Pl.'s Resp. Opp'n, Ex. 5, Dep. of Dr. Andrzej Ptasznik ("Ptasznik Dep.") 46:1-2, July 13, 2011.)

Plaintiff's grant went into effect on May 1, 2005, and provided funding for 80% of his salary. (Def.'s Mot. Summ. J., Ex. 12.) Thereafter, the relationship between Plaintiff and Dr. Gewirtz, his mentor, rapidly deteriorated. In an e-mail sent in May 2005, Dr. Gewirtz informed Plaintiff that he was not performing his work in a proper and timely manner. (Id.) Plaintiff responded that he would continue working for Dr. Gewirtz, but because 80% of his salary was now covered by his own R01 grant, he would spend only 20% of his time on Dr. Gewirtz's project. (Id.) Dr. Gewirtz determined that Plaintiff's preoccupation with his own research made it necessary to replace him. (Id., Ex. 14.) On July 28, 2005, Dr. Gewirtz relieved Plaintiff of any

2

further obligations to his grant and gave him until August 8 to vacate his laboratory space. (Id.)

During his dispute with Dr. Gewirtz, Plaintiff worked with Dr. David Pope, Defendant's Ombudsman. (Decl. of Dr. David Pope ¶ 4, 5.) The role of the Ombudsman is "to assist individuals in finding solutions to problems that they may not have been able to resolve through other channels." (Id. ¶ 3.) Dr. Pope's notes indicate that Dr. Gewirtz was angry with Plaintiff because Plaintiff hired people to work in his lab without telling him and would not provide Dr. Gewirtz with an electronic copy of his current paper. (Pl.'s Resp. Opp'n, Ex. 24 at D0185.) Dr. Gewirtz also said that Plaintiff was difficult to work with, paranoid, and believed that someone was always trying to trying to steal his work. (Id.) In short, while Dr. Gewirtz found Plaintiff to be a good scientist, he was "an impossible colleague" and wanted him "out of his life." (Id.)

Dr. Pope's notes also indicate that he spoke about Plaintiff's situation with Victoria Mulhern, who worked in Defendant's Office of Faculty Affairs. Ms. Mulhern stated that Plaintiff "must leave, but his stay here should be pleasant," and that Defendant was probably obliged to give Plaintiff another two years. (Id. at D0181.) Plaintiff avers that during his meetings with Dr. Pope and Ms. Mulhern, he told them about Dr. Emerson's comments about having to take care of a younger faculty. (Ptasznik Dep. 49:5-9, 93:24-94:3.) Dr. Pope denies that Plaintiff ever made any comments related to age discrimination, (Decl. of David Pope ¶¶ 6-8), and the record appears to be silent with respect to Ms. Mulhern.

In August 2005, Defendant arranged for Plaintiff to work with Dr. Ron Collman, a tenured professor in the Pulmonary, Allergy, and Critical Care Division. (Def.'s Mot. Summ. J., Exs. 15, 18.) Dr. Collman told Plaintiff that "[d]epending on the configuration that emerges, I might be able to create space for only a one year period . . . and that may or may not be

3

useful—but my goal is for you to use [it] for 2 years." (Def.'s Mot. Summ. J., Ex. 15.) Dr. Collman emphasized that Plaintiff was "borrowing the space, in my name, and that this space is temporarily [sic]. My hope is that it is a productive time for us both, working collaboratively, and this would give you a chance to find a permanent position elsewhere that is not 'research track' which, as you know, is a difficult place to be at Penn." (Id.) The arrangement was confirmed via letter dated October 12, 2005 from Drs. Emerson and Schafer. (Id., Ex. 18.) The letter stated that Plaintiff could use the space made available to him—which belonged to the Center for AIDS Research and the Infectious Diseases Division—until June 30, 2007. (Id.) The potential for reappointment after June 30, 2007 "would be contingent upon (a) recommendation by the Division Chief and (b) availability of space." (Id.)

In March 2006, in a Chair's Recommendation Letter written by Dr. Emerson and signed by Dr. Schafer, it was recommended that Plaintiff be reappointed for a one or two year term. (Id., Ex. 20.)[1] The reappointment was deferred by the Committee on Appointments and Promotions for two reasons: (1) it was not clear why reappointment was only requested for one year; and (2) there were concerns about Plaintiff's academic progress, particularly the lack of evidence that Plaintiff was building his own independent research program and the fact that he had given no lectures in the past five years. (Id., Ex. 21.) The revised recommendation letter signed by Dr. Schafer made clear that Plaintiff was being recommended for two years: "I recommend the reappointment of Dr. Andrzej Ptasznik . . . for two years effective [July 1, 2006]. This is a two year reappointment rather than a 3 year reappointment because his grant only

---

[1] In the opening of the Chair's Recommendation Letter, it proposes that Plaintiff be reappointed for one year only. (Id., Ex. 20.) In the "Conclusions" section, however, it states that the reappointment recommendation was for two years. (Id.)

extends to 2008." (Id., Ex. 23.) Plaintiff was subsequently reappointed "for two years effective July 1, 2006 or for the duration of the grant or contract which supports his work, whichever is the shorter period of time . . . ." (Id., Ex. 24.)

In February 2007, Dr. Emerson resigned from his position as Chief of the Division of Hematology/Oncology to become President of Haverford College, and was replaced by interim Chief Dr. Joel Bennett. (Id., Ex. 27; Decl. of Joel Bennett ¶ 3.) On September 5, 2007, Dr. Bennett wrote to Plaintiff as follows: "This letter is to remind you of our previous agreement. Your appointment as Research Assistant Professor will end on May 20, 2008 upon expiration of your R01 grant. Your appointment will not be renewed beyond that date." (Id., Ex. 28.) This was followed by another letter from Dr. Richard Shannon, the Chairman of the Department of Medicine. (Id., Ex. 30.) Dr. Shannon referenced a recent meeting between himself and Plaintiff, and explained to him that

> [m]y goal was to make it clear that your appointment in the Department of Medicine will be terminated as of April 30, 2008. Over the course of the last two years, we have afforded you the opportunity to continue your work in space graciously lent to you by Dr. Ron Coleman [sic] and CFAR, specifically to afford you the opportunity to submit the competitive renewal of your R01. I understand that this has been achieved and will soon be scored at an NIH study section. Irrespective of whether the grant receives a fundable score, Penn can not accept the award due to lack of space or alternate suitable space but will be willing to transfer it to an institution of your choosing.

(Id.) Plaintiff's last day of employment with Defendant was April 30, 2008. (Def.'s Mem. 15; Pl.'s Resp. Opp'n 19.)

In November 2007, Plaintiff filed a grievance with the Faculty Grievance Commission and alleged that he was terminated because of his age. (Pl.'s Resp. Opp'n, Ex. 15.) The panel that heard the grievance concluded that while Plaintiff's work environment may have been

"poisoned by ill will and hostility," he did not establish that he was the victim of age discrimination. (Def.'s Reply, Ex. B at D2066.) Accordingly, on June 19, 2008, Ronald Daniels, Defendant's Provost, informed Plaintiff that his request for reinstatement was denied. (Pl.'s Resp. Opp'n, Ex. 20.)

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on June 27, 2008. (Id., Ex. 31.) Thereafter, on August 6, 2010, he filed his Complaint in this Court. The Complaint alleges the following: (I) Defendant violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA") by terminating him because of his age and/or by having policies that disparately impacted employees over the age of forty, and by retaliating against him for reporting age discrimination; and (II) Defendant violated the Pennsylvania Human Relations Act, 43 Pa.C.S. § 951 et seq. ("PHRA") by terminating him because of his age and retaliating against him for reporting age discrimination. (Compl. ¶¶ 43-52.) Defendant filed the present Motion for Summary Judgment on October 5, 2011. Plaintiff filed his Response in Opposition on October 31, 2011, and Defendant filed a Reply Brief on November 16, 2011. Finally, on February 14, 2012, this Court heard oral arguments by both parties on the issues raised in Defendant's Motion.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Summary judgment may be granted when "the evidence is merely colorable . . . or is not significantly probative." Id. at 249-50 (citations omitted).

## III. DISCUSSION[2]

Plaintiff claims Defendant discriminated against him by terminating him on the basis of age and retaliated against him because he complained of age discrimination. (Compl. ¶ 45.) In the alternative, Plaintiff claims that Defendant's practices and policies had a disparate impact on employees over the age of forty. (Id. ¶ 47.) Defendant moves for summary judgment on all of these claims. The Court considers each in turn.

### A. Discrimination

"The ADEA prohibits age discrimination in employment decisions against persons who are at least 40 years of age." Kelly v. Drexel Univ., 94 F.3d 102, 104 (3d Cir. 1996) (citing 29 U.S.C. § 623(a)(1)). In the absence of direct evidence of discrimination in violation of the ADEA, courts apply the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Casas v. Bank of Am., N.A., No. Civ.A.09-6133, 2011 WL 3837071, at *3 (E.D. Pa. Aug. 30, 2011). Under the McDonnell Douglas scheme,

> (1) plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination.

Parker v. Verizon Pa., Inc., 309 F. App'x 551, 555 (3d Cir. 2009) (citing McDonnell Douglas, 411 U.S. at 802).

In its Motion for Summary Judgment, Defendant analyzes Plaintiff's discrimination claim

---

[2] "Pennsylvania courts 'generally interpret the PHRA in accord with its federal counterparts' such as the ADEA." Baker v. United Defense Indus., Inc., 403 F. App'x 751, 754 (3d Cir. 2010) (quoting Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)). Accordingly, the Court considers Plaintiff's ADEA and PHRA claims concurrently.

under the McDonnell Douglas scheme. (See Def.'s Mem. 19-27.) Plaintiff responds that application of this framework is unnecessary because he has introduced direct evidence of discrimination. (Pl.'s Resp. Opp'n 23-27.) Specifically, Plaintiff points to a meeting in which Dr. Emerson referred to him as "young man" and informed him that he could not have his own independent lab space because "we have younger and better faculty to take care of." (Id. at 23-24.) Plaintiff also contends that Dr. Emerson made similar comments at a later date and that Dr. Gewirtz had previously told him that Dr. Emerson liked to promote young people. (Id. at 24.)

"Direct evidence" is that which is "sufficient to allow the jury to find that the decision makers placed substantial negative reliance on the plaintiff's age in reaching their decision." Miller v. Laurel Highlands Sch. Dist., No. Civ.A.10-1130, 2011 WL 4748985, at *2 (W.D. Pa. Oct. 7, 2011) (citing Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002)). In Miller, the plaintiff asserted that the defendant told him "'[w]e work to give young administrators and teachers opportunities to improve themselves,'" and argued that this was direct evidence of discrimination. Id. The court disagreed, finding that while the defendant's comment "may constitute circumstantial evidence of some general age bias, [it] is insufficient to allow a jury to find that Defendant placed 'substantial negative reliance' on Plaintiff's age" in hiring someone other than the plaintiff. Id.

The Court finds the present case analogous to Miller. Assuming Dr. Emerson and Dr. Gewirtz made the comments referenced above, they can best be characterized as "circumstantial evidence of some general age bias." This conclusion is supported by the fact that Plaintiff was reappointed to his position after the comments were made, that he was not terminated until several years later, when Dr. Emerson was no longer employed by Defendant, and that neither

Dr. Emerson nor Dr. Gewirtz were involved in the ultimate decision to terminate Plaintiff. Accordingly, the Court applies the McDonnell Douglas scheme.

In order to establish a prima facie case of discrimination under the ADEA, the plaintiff must demonstrate the following: "(1) he is over forty years of age; (2) he is qualified for the position in question; (3) he suffered from an adverse employment decision; and (4) his replacement was sufficiently younger to permit a reasonable inference of age discrimination." Prisco v. Methodist Hosp., No. Civ.A.10-3141, 2011 WL 1288678, at *3 (E.D. Pa. Apr. 4, 2011) (citing Hill v. Borough of Kutztown, 455 F.3d 225, 247 (3d Cir. 2006)). The Third Circuit Court of Appeals has held that "the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797-98 (3d Cir. 2003) (citing Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996)). To that end, the Third Circuit has at times taken a more relaxed approach to the fourth element of the prima facie test, and has

> rejected a requirement that a plaintiff prove he was replaced by someone outside the protected class to prove a prima facie case of discrimination. . . . We require only that the plaintiff show that the employer continued to seek out individuals with similar qualifications after refusing to rehire the plaintiff under circumstances that raise an inference of unlawful discrimination.

Id. at 797 n.7 (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999)). The Court emphasizes, however, that nothing in the Third Circuit's jurisprudence has diminished the plaintiff's burden of establishing the prima facie case in order to proceed with the litigation. Indeed, in decisions subsequent to Sarullo and Pivirotto, the Third Circuit has made clear that failure to satisfy the fourth element of the prima facie case is fatal to a plaintiff's claim. See, e.g., Hyland v. Am. Int'l Grp., 360 F. App'x 365, 367-68 (3d Cir. 2010); Grove v. Admiral Peary

10

Area Vocational-Technical Sch., 221 F. App'x 101, 104 (3d Cir. 2007).

Here, Defendant argues that Plaintiff's prima facie case must fail because he cannot establish that he was qualified for the job or was replaced by a sufficiently younger person. (Def.'s Mem. 21-23.) First, with respect to qualification, Defendant contends that a research assistant professor such as Plaintiff must have an outside source of funding to support his salary. (Id. at 21.) According to Defendant, Plaintiff cannot show that he was qualified because his external funding ended on the day he was terminated. (Id.) In response, Plaintiff argues that there is a question of fact as to whether outside funding was truly a necessary qualification for his position. (Pl.'s Resp. Opp'n 27-30.) In support of this argument, Plaintiff notes that the October 10, 2007 termination letter he received stated that he would be fired regardless of whether he obtained funding. (Id. at 27-28.) In addition, he points out that Defendant's written policy states that "'appointments to the Research Faculty are contingent upon external funding and may be terminated when the funding ceases. . . .'" (Id. at 29 (quoting Def.'s Mot. Summ. J., Ex. 1).) Plaintiff contends that the phrase "may be terminated" indicates that the decision to fire an employee on the basis of insufficient funding is discretionary rather than mandatory. (Id. at 29.) Finally, he states that his colleague, Dr. Howard Gamper, testified that in the absence of a grant, an employee could potentially receive funding through a sponsor or the departmental chairman. (Id.) For all the reasons cited by Plaintiff, the Court finds that there is an issue of fact as to whether Plaintiff was qualified for his position, and cannot grant summary judgment on this basis.

Second, Defendant argues that Plaintiff's prima facie case fails because he cannot establish that he was replaced by anyone, let alone someone substantially younger than him.

11

(Def.'s Mem. 21-23.) In response, Plaintiff cites to three examples of "replacements," which he argues satisfy this element of the prima facie case. First, he contends that Dr. Susan Shetzline, a woman who is approximately twenty years younger than him, took over his part of his work when he left Dr. Gewirtz in 2005. (Pl.'s Resp. Opp'n 30.) Second, he avers that Dr. Noor-e-Mobeen Malik, who was thirty-seven at the time of Plaintiff's termination, continued Plaintiff's work for Dr. Collman after he left. (Id.) Finally, he argues that four research assistant professors have been hired by Defendant since Plaintiff's termination, and that three of the four are sufficiently younger than him to give rise to an inference of discrimination. (Id.)[3]

The Court agrees with Defendant that Plaintiff has failed to satisfy the fourth element of his prima facie case. With respect to Plaintiff's argument that Dr. Shetzline constitutes a "replacement," the Court notes that Plaintiff's claim is not premised on a change of duties in 2005, but on his termination in 2008. As such, even if Dr. Shetzline continued Plaintiff's work for Dr. Gewirtz after Plaintiff moved to Dr. Collman's lab space in 2005, it cannot be cited as evidence that Plaintiff was replaced when his employment ended in 2008.

Next, the Court is unable to find any evidence that Dr. Malik assumed Plaintiff's duties after his termination. In a Statement submitted to the Court, Dr. Malik avers that she was hired by Dr. Collman as a "Research Associate" in July 2006, that she worked closely with Plaintiff—who supervised her work—until the time of his termination, and that Dr. Collman

---

[3] Plaintiff also cites to Showalter v. University of Pittsburgh Medical Center, 190 F.3d 231 (3d Cir. 1999) for the proposition that, when a defendant cites to a broad "reduction in force" as the reason for a plaintiff's termination, the plaintiff need not prove that he or she was actually replaced, and can establish a prima facie case merely by showing that the defendant retained younger employees. (Pl.'s Resp. Opp'n 30-31.) In this case, Defendant has not argued that Plaintiff's position was eliminated as part of a reduction in force, and so the rule discussed in Showalter is inapplicable.

became her most direct supervisor after Plaintiff left. (Pl.'s Resp. Opp'n, Ex. 12.) She also stated that she resigned from her position in August 2009 to pursue an opportunity in Chicago. (Id.) Dr. Collman testified that after Plaintiff was terminated, Dr. Malik "continued a short while [before resigning]. I remember she continued a couple of experiments to tidy up to overlap with the new person that I brought in to continue on with an aspect of the project." (Pl.'s Resp. Opp'n, Ex. 3, Dep. of Dr. Ronald Collman, 24:4-7, Sept. 1, 2011.)[4] This evidence merely demonstrates that after Plaintiff was terminated, Dr. Malik continued *her own* work on a project or projects upon which both she and Plaintiff may have collaborated; it does not establish that Dr. Malik replaced Plaintiff or continued his work.

The Court next turns to the four research assistant professors who were hired by Defendant after Plaintiff's termination. As noted by Defendant, Plaintiff worked in the Hematology/Oncology Division, while these individuals were hired to work in Sleep Medicine, Pulmonary Allergy and Critical Care, Renal Electrolyte and Hypertension, and Experimental Therapeutics. (Def.'s Reply Br. 4; Pl.'s Resp. Opp'n, Ex. 14.) According to Defendant, "[n]one of these are in Plaintiff's scientific area, none overlapped with his research, none replaced [P]laintiff's research project which became unfunded, and Plaintiff has not presented any evidence about the funding sources for their jobs." (Def.'s Reply Br. 4-5.) The Court agrees. Assuming that at least three of these research assistant professors were sufficiently younger than Plaintiff for purposes of his prima facie case, Plaintiff's only evidence with respect to these employees is a spreadsheet that lists their dates of birth, the dates that they were hired, the

---

[4] Plaintiff has not provided the Court with evidence of either the age, the identity, or the job functions of the "new person" referred to by Dr. Collman. Accordingly, the hiring of this person cannot be cited as evidence that Plaintiff was replaced by someone sufficiently younger.

divisions in which they work, their current employment status, and, if they were terminated, the reason for the termination. (Pl.'s Resp. Opp'n, Ex. 14.) None of this data indicates whether any of the research assistant professors continued the work that Plaintiff performed in conjunction with his grant or with Dr. Collman. In the absence of any information concerning what these employees actually did, the Court is left only with a list of four employees who, like Plaintiff, were employed in Defendant's Department of Medicine, but whose research apparently concentrated on areas entirely unrelated to Plaintiff's own work. This is simply not enough evidence for a jury to conclude that the research assistant professors hired after Plaintiff's termination constituted "replacements" for purposes of his ADEA claim.[5]

In sum, the Court finds that Plaintiff failed to establish that he was replaced—or that Defendant sought to replace him—with someone sufficiently younger to raise an inference of age discrimination. Because Plaintiff cannot meet his initial burden of proving a prima facie case, the Court need not continue the McDonnell Douglas analysis any further, and Defendant's Motion for Summary Judgment on the ADEA discrimination claim is granted.

### B. Retaliation

In order to establish a claim for retaliation, the plaintiff must demonstrate: "(1) he was engaged in protected activities; (2) the employer took an adverse employment action after or at the same time as the employee's protected activity; and (3) a causal link exists between the

---

[5] In the Factual Background section of his Response in Opposition, Plaintiff also suggests that he was replaced by "Dr. Zhang." (Pl.'s Resp. Opp'n 11.) According to the evidence submitted by Plaintiff, Dr. Zhang was hired in a different department (Pathology) two years before Plaintiff was terminated. (Pl.'s Resp. Opp'n, Ex. 13, Dep. of Dr. Marc Greene, 22:1-17, June 24, 2011.) Therefore, the Court finds that Dr. Zhang cannot be considered a replacement.

14

protected activity and the adverse action." Mitchell v. MG Indus., Inc., No. Civ.A.05-4073, 2011 WL 4549411, at *10 (E.D. Pa. Sept. 30, 2011) (citing Glanzman v. Metro. Mgmt. Co., 391 F.3d 506, 515–16 (3d Cir. 2004)). Opposing discrimination on the basis of age constitutes protected activity. Id. (quoting Barber v. CSX Distrib. Serv., 68 F.3d 694, 702 (3d Cir. 1995)). Significantly, when the individuals responsible for the decision to terminate were unaware that the plaintiff had engaged in protected activity, they cannot be said to have retaliated against the plaintiff for doing so. Dooley v. Roche Lab Inc., 275 F. App'x 162, 165 (3d Cir. 2008); Bedford v. Se. Pa. Transp. Auth., 867 F. Supp. 288, 293 (E.D. Pa. 1994).

Here, Plaintiff contends that Defendant terminated him in retaliation for the complaints he made pertaining to age discrimination. (Compl. ¶ 45.)[6] Defendant moves for summary judgment on this claim, arguing that none of the people responsible for Plaintiff's termination were aware that he had made any such complaints. (Def.'s Mem. 27-29.) Defendant contends that even if Plaintiff complained of discriminatory comments to Dr. Pope in 2004 or 2005, this does establish that Drs. Bennett and Shannon—who made the decision to terminate Plaintiff—knew about such complaints. (Id.) In response, Plaintiff contends that in addition to

---

[6] Plaintiff also suggests that the Provost's denial of his administrative appeal was an additional act of retaliation. (Pl.'s Resp. Opp'n 15-16, 42.) In support of this argument, he states that "Dr. Rubenstein wrote a letter to the Provost criticizing the [Faculty Grievance Commission's] reports and the faculty involved in an effort to influence the Provost's review of the majority and minority reports." (Id. at 15.) It is not clear from the parties' briefs who Dr. Rubenstein is, but there is certainly no evidence that he was motivated by any discriminatory intent or attempted to unduly influence the Provost. The letter cited by Plaintiff merely expresses Dr. Rubenstein's concern that the Faculty Grievance Commission—which had already found no evidence of age discrimination—misused a legal term and appeared to act as an advocate for the employee rather than as a neutral arbiter. (Pl.'s Resp. Opp'n, Ex. 18.) In short, there is simply no evidence that the Provost's decision to deny Plaintiff's administrative appeal was motivated by an intent to retaliate.

Dr. Pope, he also told Ms. Mulhern about the comments made by Drs. Gewirtz and Emerson, and "[t]here can be no doubt that Ms. Mulhern was involved in the decision to terminate. . . ." (Pl.'s Resp. Opp'n 38.)[7]

Despite Plaintiff's argument to the contrary, there is simply no evidence that Ms. Mulhern was involved in the decision to terminate Plaintiff. Indeed, in her deposition, Ms. Mulhern explicitly stated that she was not involved in the termination process:

> Q: [W]ho were the people in the decision-making process with respect to the decision to terminate the plaintiff's employment?
> A: Doctor Richard Shannon, chair of the department of medicine, Doctor Joel Bennett who was serving as the interim chief of the division of hematology/oncology.
> Q: Those were the only two, ma'am?
> A: Yes, those—yes.

(Pl.'s Resp. Opp'n, Ex. 10, Dep. of Victoria Mulhern, 29:3-11, Sept. 26, 2011.) In Declarations submitted to this Court, both Dr. Shannon and Dr. Bennett stated that they were unaware of any complaints Plaintiff had made about age discrimination. (Shannon Decl. ¶¶ 10, 11; Bennett Decl. ¶¶ 12, 13.) Plaintiff has not introduced any evidence to contradict these statements and allow a jury to find either: (a) someone other than Dr. Shannon and Dr. Bennett were involved in the termination process, or (b) Dr. Shannon or Dr. Bennett were aware that Plaintiff had complained of age discrimination. Accordingly, because Plaintiff cannot show a causal link

---

[7] Plaintiff notes that "[a] defendant may not avoid liability where 'those exhibiting discriminatory animus influenced or participated in the decision to terminate.'" (Pl.'s Resp. Opp'n 38 n.16 (quoting Abramson v. William Paterson Coll. of NJ, 260 F.3d 265, 286 (3d Cir. 2001)).) There is no evidence, however, that either Dr. Emerson or Dr. Gewirtz—the only two individuals who allegedly made discriminatory comments—had any influence on the decision to terminate Plaintiff in 2008. Indeed, not only did Dr. Emerson recommend Plaintiff for reappointment a year after he purportedly made remarks pertaining to Plaintiff's age, he no longer worked for Defendant at the time Plaintiff was let go.

16

between his protected activity and his termination, Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim is granted.

### C. Disparate Impact and Failure to Exhaust Administrative Remedies

"A disparate impact claim challenges 'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity . . . .'" Wilson v. Phila. Hous. Auth., No. Civ.A.06-4932, 2008 WL 699001, at *5 (E.D. Pa. Mar. 12, 2008) (quoting Raytheon v. Hernandez, 540 U.S. 44, 52 (2003)). Like all causes of action under the ADEA, however, a disparate impact claim cannot be brought in federal court unless it is raised in the initial EEOC complaint. See Ruehl v. Viacom, Inc., 500 F.3d 375, 382 (3d Cir. 2007) ("[A] judicial complaint under the ADEA will be dismissed for failure to exhaust administrative remedies if a supporting EEOC charge was not filed within 180 or 300 days (depending on state law) of notification to the employee of the adverse employment action."). The Third Circuit has held that "'the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" Webb v. City of Phila., 562 F.3d 256, 263 (3d Cir. 2009) (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976)).

In this case, Plaintiff alleges that Defendant's practices and policies had a disparate impact on employees over the age of forty. (Compl. ¶ 47.) Defendant argues that this claim must fail because Plaintiff did not raise the issue of disparate impact at his EEOC proceeding, and therefore failed to exhaust his administrative remedies. (Def.'s Mem. 32.) In response, Plaintiff points to the fact that Defendant produced a document to the EEOC which included the

17

names, ages, and termination dates of every research assistant who was fired between July 31, 2004 and the time of Plaintiff's termination. (Pl.'s Resp. Opp'n 44.) From this, Plaintiff concludes that "[t]he only reasonable assumption is that the EEOC requested this information and that the potential disparate impact was not only within the scope of the EEOC investigation that could reasonably be expected to grow out of the charge of discrimination, but rather was actually within the scope of the investigation conducted by the EEOC in this matter." (Id.)[8]

After a thorough review of the EEOC record, the Court finds no evidence of a disparate impact allegation, and therefore concludes that Plaintiff failed to exhaust his administrative remedies with respect to this claim. Even assuming, as Plaintiff argues, that the EEOC requested the document with the termination dates of other employees, this does not establish that Plaintiff *himself* raised the issue of disparate impact. Indeed, Plaintiff's own allegations made during the EEOC investigation support Defendant's argument that the discrimination claim was limited solely to Plaintiff. For example, in the initial "EEOC Statement of Particulars," Defendant's actions are discussed only in so far as they affected Plaintiff, and there is no reference to allegations of other similarly-situated employees being harmed by facially-neutral policies. (Def.'s Reply, Ex. B at D2020-D2022.) In addition, in his Rebuttal to Defendant's Response to the Statement of Particulars, Plaintiff states that "[a]ll available facts, which are corroborated by the documentary evidence and credible witnesses, indicate that [Plaintiff's] employment was terminated in a manner *completely inconsistent with University policies*." (Id. at D2037

---

[8] Plaintiff also suggests that a disparate impact claim falls within the scope of an EEOC investigation after a defendant raises a "reduction in force" defense. (Pl.'s Resp. Opp'n 43-44.) As the Court already noted, however, Defendant never argued that Plaintiff was terminated as part of a reduction in force.

(emphasis added).) This demonstrates that the alleged harm was not caused by Defendant's adherence to a policy that had a disparate impact on older employees, but rather by Defendant's departure from the policies that it had in place.

Furthermore, in an e-mail to an EEOC investigator dated December 7, 2009, Plaintiff referred to his "charge of discrimination, retaliation and harassment." (Id. at D1982.) Nowhere in this communication did he indicate that he was pursuing a disparate impact theory of liability. Finally, and perhaps most tellingly, when Plaintiff was asked by the EEOC whether anyone else was in a similar situation, he explicitly stated that "[n]obody was in a situation similar to mine. I was treated differently." (Id. at D2074.)

In sum, the evidence contained in the EEOC record demonstrates that Plaintiff's allegations amounted to "at most, a complaint of discriminatory treatment, not a complaint of disparate impact." Wilson, 2008 WL 699001, at *5. Because Plaintiff failed to exhaust his administrative remedies, the Court need not consider the merits of the disparate impact claim, and Defendant's Motion for Summary Judgment is granted.[9]

## IV. CONCLUSION

For all of the foregoing reasons, the Court finds insufficient evidence demonstrating that Plaintiff was replaced by a substantially younger person to give rise to an inference of age discrimination, that the individuals responsible for Plaintiff's termination knew that he had

---

[9] Defendant also argues that Plaintiff failed to exhaust his administrative remedies with respect to his PHRA claim. (Def.'s Mem. 34-36.) Plaintiff's PHRA claim is based on the same allegations as the ADEA claim, and because the Court is granting judgment in favor of Defendant on the ADEA claim, it likewise follows that judgment on the PHRA claim must be entered in favor of Defendant as well. Accordingly, Defendant's exhaustion argument with respect to the PHRA claim is moot, and the Court declines to address it.

19

complained of discriminatory comments, or that Plaintiff exhausted his administrative remedies with respect to his disparate impact claim. Accordingly, Defendant's Motion for Summary Judgment is granted in its entirety.

    An appropriate Order follows.